UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re Steven Deehl,

            Debtor.

_____/

Mark Latunski, by Conservator
Paul Latunski,

            Plaintiff,

v.

Steven Deehl,

            Defendant.

_____/

Case No. 25-30883-jda
Chapter 7
Hon. Joel D. Applebaum

Adv. Pro. No. 25-03052-jda

## OPINION GRANTING IN PART AND DENYING IN PART CROSS- MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' Cross-Motions for Summary Judgment. (Dkt. Nos. 11 and 19). Plaintiff seeks a determination that a state court judgment for trespass and ejectment is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A)(fraud) and (a)(6)(willful and malicious injury). Defendant responds that: (1) *res judicata* precludes this Court from litigating the issue of fraud; (2) even if *res judicata* does not apply, Plaintiff cannot establish all of the elements required to render a debt nondischargeable under section 523(a)(2); and (3) Plaintiff's claim under section 523(a)(6) is based solely on vicarious liability and fails as a matter of

law.  For the reasons set forth in this Opinion, Plaintiff's Motion is granted as to the § 523(a)(6) claim and denied as to § 523(a)(2) claim.  Defendant's Cross-Motion is denied as to the § 523(a)(6) claim and granted as to the § 523(a)(2) claim.

# I. <u>FACTUAL BACKGROUND</u>

## A. <u>Procedural Background</u>

On April 24, 2025, defendant/debtor Steven Deehl (hereinafter "Defendant") filed a voluntary chapter 7 bankruptcy petition. On Schedule D (secured debts), Defendant lists a debt owed to "Mark Latunski/Paul Latunski" in the amount of $906,933.  This debt arises from a state court judgment against Defendant for trespass and ejectment. According to Schedule D, the judgment is secured by Defendant's home.

On May 5, 2025, plaintiff Mark Latunski, through his conservator (and brother) Paul Latunski, filed a claim, arising from the state court judgment, in the amount of $1,033,784.21. (Claim No. 1).[1]  The claim states that it is secured by real estate (Defendant's residence) and perfected by a recorded notice of levy. (Dkt. 10).

---

[1] Because Mark Latunski is incarcerated, all references to "Plaintiff" in this Opinion refer to actions taken by conservator Paul Latunski, acting on Mark Latunski's behalf.

On August 1, 2025, Plaintiff filed the captioned two-count adversary complaint against Defendant seeking to have the state court judgment declared non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A)(fraud) and (a)(6)(willful and malicious conduct). On September 3, 2025, Defendant filed an answer to the complaint. (Dkt. 8).

On October 1, 2025, Plaintiff filed the present Motion for Summary Judgment. (Dkt. 11). In his Motion, Plaintiff asserts that the facts established by the state court in support of its finding that Defendant was liable for trespass and ejectment are sufficient to support a finding of non-dischargeability by this Court. Plaintiff also contends that collateral estoppel and the Rooker-Feldman Doctrine apply to bar Defendant from relitigating the facts and issues addressed by the state court.

On October 24, 2025, Defendant filed his Cross-Motion for Summary Judgment (Dkt. 19), asserting that Plaintiff failed to raise the issue of fraud before the state court and the doctrine of *res judicata* now bars Plaintiff from litigating that issue in this forum. Moreover, even if Plaintiff is permitted to pursue a fraud claim in this Court, Defendant contends that Plaintiff cannot establish all the elements required for a nondischargeable claim under § 523(a)(2)(A). With respect to the § 523(a)(6) claim, Defendant asserts that the state court judgment against him is based solely on vicarious liability and fails as a matter of law.

3

## B. The State Court Proceedings

In 2022, Plaintiff sued Defendant and Defendant's son, Alex Deehl, in the Michigan 35th Circuit Court (Shiawassee County)(hereinafter the "Circuit Court") for trespass and ejectment relating to the foreclosure sale of Plaintiff's home. Plaintiff asserted that Defendant and his son wrongfully interfered with Plaintiff's right to redeem the home after the foreclosure sale and that they unlawfully took possession of the home, damaged the home, and illegally disposed of Plaintiff's personal possessions. The Circuit Court found both Defendant and his son liable on both counts. The following factual recitation is based upon the bench opinion issued by the Circuit Court on October 14, 2022 (hereinafter "Cir. Ct. at __"), and the written opinion affirming the Circuit Court's bench opinion issued by the Michigan Court of Appeals on May 30, 2024 (hereinafter "App. Ct. at __).

On February 26, 2020, Plaintiff's home, located at 703 West Tyrell Road, Morrice, Michigan (hereinafter "the Property"), was auctioned at a foreclosure sale. Because Defendant could not attend the sale, his son, Alex, placed the winning bid on his father's behalf and Defendant thereby became the owner of the house subject

to Plaintiff's right of redemption.[2]  On that same date, Paul Latunski was named Mark Latunski's conservator. (App. Ct. at 1).

Eight days later, on March 5, 2020, Plaintiff's attorney sent Defendant "a letter informing him that Paul had obtained conservatorship on Plaintiff's behalf and was actively working to redeem the property." (Cir. Ct. at 13).  The letter directed Defendant to "stay off the premises." (App. Ct. at 2).[3]

---

[2] Under Michigan law, a property owner has six months to redeem the property after a foreclosure sale.  MCLA 600.3240. However, if the property is abandoned, the redemption period can be shortened to 30 days. *Id*.  The process for claiming that a property has been abandoned is set forth at MCLA 600.3241a and requires: (1)  that the mortgagee personally inspect the premises to determine that no one is "presently occupying or will occupy the premises"; (2) post a notice on the property (and send the notice by certified mail to the mortgagor's last known address) stating that the mortgagee considers the property abandoned and that the mortgagor will lose all rights of ownership 30 days after the foreclosure sale.  Within 15 days of the notice, the mortgagor, their heirs, or personal representative must respond to the notice in writing, stating that the property is not abandoned.

[3] For purposes of these Cross-Motions, it is important to understand Michigan law regarding the rights held by an owner of real property generally, as well as the rights an owner retains post-foreclosure but during the redemption period.  As explained by the Michigan Court of Appeals,

> A person having all possible rights incident to ownership of a parcel of property has the entire bundle of sticks or a fee simple title to the property. *Adams v. Cleveland–Cliffs Iron Co.,* 237 Mich.App. 51, 57 & n. 6, 602 N.W.2d 215 (1999). **Important rights flowing from property ownership include the right to exclusive possession**, **the right to personal use and enjoyment, the right to manage its use by others**, **and the right to income derived from the property.** *Id.* at 57– 58 & n. 7, 602 N.W.2d 215. Indeed, "title," is defined in Black's Law Dictionary (9th ed.), as "[t]he union of all elements (as ownership,

5

Notwithstanding the March 5, 2020 letter, on March 10, 2020, Defendant "began efforts to shorten the redemption period by *falsely* claiming that Plaintiff's property ha[d] been abandoned." (Cir. Ct. at 13, emphasis added). Specifically, "[Defendant] *Steven* went on to the property to post a notice that the property was abandoned." (*Id.* at 5, emphasis added).[4]

On March 28, 2020, Alex Deehl moved into the house and "immediately began removing personal property from the house and preparing the residence for renovations." (App. Ct. at 2).[5] Once Alex entered the home, he "changed the locks,

---

possession, and custody) constituting the legal right to control and dispose of property...."

*Eastbrook Homes, Inc. v. Treasury Dep't*, 820 N.W.2d 242, 249 (Mich. App. 2012)(emphasis added). The purchaser at a foreclosure sale does **not** acquire these rights, specifically possessory rights, during the redemption period. Instead, the mortgagor remains in possession and enjoys the benefits of ownership until the redemption period expires. See *People v. March*, 886 N.W.2d 396,418-21 (Mich. 2016).

[4] The Circuit Court's opinion stated that the court "sees a link between those two events, and presumes that … Steven's efforts to deem the property abandoned were a result of that [March 5th] letter." (Cir. Ct. at 13).

[5] As explained by the Circuit Court, on that same date, there was an altercation between Alex and the conservator. The conservator called the police because Alex was unlawfully occupying the home. Alex also called the police because the conservator was confronting him while holding a shotgun. "Alex told the reporting office[r] that he, Alex, had purchased the home at auction and was granted access to the home within thirty days of the purchase date. Alex said that he waited for an additional five days to enter the property. The officer said Alex was adamant that it was his property and he had every right to be there. The officer said he thought it was Alex's property." (*Id.* at 9). The conservator was later released from custody

placed the utilities in his name, and updated his address to reflect that he resided in the Property." (Cir. Ct. at 5). Both Defendant and Alex had mail sent to them at the Tyrrell Road address. (*Id.* at 13). Defendant also had the property taxes put in his name by listing himself as the owner of the Property. (*Id.*).

On April 9, 2020, Defendant's attorney sent an email to Plaintiff's attorney stating that "Steven [Defendant] has no responsibility for Alex's occupation of the Property and that Steven told Alex to vacate the Property."[6] The email also stated that Plaintiff was "welcome to initiate summary proceedings to remove Alex from the Property." (*Id.* at 14). The Circuit Court noted that "[Defendant's] Counsel sent

---

and barred from returning to the property. (*Id.* at 9-10.) When asked, during a deposition, whether he had ever told officers that he purchased the home, Alex asserted his right not to incriminate himself. (*Id.* at 10). The Circuit Court found that "*Alex defrauded law enforcement* so he could use them as a proxy to exclude Paul from the property." (*Id.* at 11, emphasis added). According to the Appellate Court, Steven claimed that it was this interaction between the conservator and Alex that "made Steven decide against having any further involvement in the deal. Yet, Steven continued to visit the property. He falsely asserted that he was at the house only once. On further inquiry, Steven admitted to at least four visits. The [Circuit] Court could reasonably infer that Steven had likely been on the land on other occasions." (App. Ct. at 5-6).

[6] The state court record is unclear regarding precise dates on which Defendant consulted an attorney. What is clear is that Defendant did, in fact, consult legal counsel. *See e.g.*, Circuit Court at 13 ("Steven made several efforts to frustrate the redemption process, including dropping out of communication with his attorneys"); Cir. Ct. at 4 (Steven's attorney sent Plaintiff's attorney an email); App. Ct. at 5 (Steven avoided redemption by failing to respond to attempts by his own attorney (Mark Hanna) to facilitate the transaction. Early in these proceedings, Steven admitted that Hanna was his attorney at that time").

that email approximately two weeks into the eviction moratorium. . . that was enacted by our legislat[ure] in response to the Corona virus.  So, that suggestion rings hollow" and the Circuit Court specifically did "not find the email credible, given the in-court testimony." (*Id.*).[7]

From March 5, 2020 through June 8, 2020, "[Defendant] Steven made several efforts to frustrate the redemption process, including dropping out of communication with his attorneys and repeatedly changing the terms by which he would accept the redemption payment. (*Id.* at 13).  The conservator was eventually forced to deposit the redemption funds with the register of deeds. (*Id.* at 13-14). The Circuit Court inferred that Defendant "frustrat[ed] the redemption efforts hoping the redemption period would run and the Property would vest with him . . . ." (*Id.* at 14).

---

[7] The Circuit Court went on to note that,

> Plaintiffs' counsel asked Steven why he allowed Alex to occupy the property instead of calling the police to oust Alex.  Steven said that Alex is his own man, and Steven can't control him.  This response did not meaningfully answer the question. It's also not credible, given that Alex acted at Steven's discretion in buying the property, drove Steven's vehicles, used dealership plates from Steven's vehicle, and lived in the home all while Steven tried to thwart the redemption process.

(Cir. Ct. at 14-15).

On June 19, 2020, Plaintiff filed the state court complaint against Defendant and his son for unlawful ejectment and common law trespass. It also sought to quiet title.[8]

On August 27, 2020, 80 days after the redemption funds were deposited with the register of deeds (June 8, 2020), Defendant finally obtained the funds. (App. Ct. at 2).

On September 3, 2020, after Plaintiff brought summary proceedings in Circuit Court and secured a judgment of possession that resulted in Alex's eviction from the home, Plaintiff was finally able enter the home. He found that the house had been damaged, and that personal property was missing. (*Id.*).

Alex did not timely respond to Plaintiff's Amended Complaint and motion for summary disposition. The Circuit Court defaulted Alex on the issue of liability and permitted him to defend only with respect to damages. After a three-day bench trial, the Circuit Court found Alex liable for both trespass and unlawful ejectment. (Cir.

---

[8] On May 20, 2021, an amended complaint (mistakenly titled "Second Amended Complaint" but hereinafter referred to as "the Amended Complaint") sought relief for unlawful ejectment, trespass and conversion. While the Amended Complaint does not assert a fraud claim, the allegations regarding damages specifically assert that the state court should "[a]ward Plaintiff exemplary damages, including reasonable attorney fees and costs, based on Defendants' *willful and malicious* trespass." (Dkt. 19-8 at 8 ¶ C)(emphasis added).

9

Ct. at 12).[9]   With respect to Defendant, the Circuit Court found that Alex was Defendant's agent and that Defendant was vicariously liable for Alex's actions. (*Id.* at 15).   The Circuit Court specifically found Defendant's testimony not credible and that "[t]he evidence preponderates towards a finding that Alex's occupation of the home occurred with Steven's acquiescence, if not by Steven's design.   Thus, the [Circuit] Court finds the existence of an agency relationship and finds Steven vicariously liable for Alex's conduct." (*Id.* at 15).

In its discussion of damages, the Circuit Court specifically found Defendant's "*conduct flagrant and fraudulent*." (*Id.* at 16, emphasis added).   The Circuit Court calculated Plaintiff's actual damages at $302,311 and awarded treble damages under the unlawful ejectment statute, MCL 600.2918.[10]   Ultimately, the Circuit Court held

---

[9] As explained by the Circuit Court,
> Alex testified only briefly in this matter, since he asserted his privilege against self-incrimination during the discovery process of this matter. Other than an attempt to introduce hearsay, the only affirmative testimony Alex gave was that he had no excuse for his actions.   That statement, at least to the Court, seemed credible.

Cir. Ct. at 6-7.

[10] MCLA 600.2918(1) provides that "[a]ny person who is ejected or put out of any land or tenements in a forcible and unlawful manner, or being out is afterwards held and kept out, by force, is entitled to recover 3 times the amount of his or her actual damages or $200.00, whichever is greater, in addition to recovering possession."

Defendant liable in the amount of $906,933, and Alex liable for $948,137.84. The Circuit Court made Defendant and Alex jointly and severally liable. (*Id.* at 17).[11]

Defendant appealed the Circuit Court's decision arguing that Alex was his agent only for the limited purpose of bidding on the Property and that he could not be held liable for Alex's actions after the foreclosure sale because Alex acted without his authority. In an opinion issued on May 30, 2024, the Court of Appeals disagreed, finding that "Alex served as Steven's agent throughout his residency at the subject property" and that "[b]ecause Alex was Steven's agent in possessing the property, Steven could be held vicariously liable for Alex's unlawful ejectment of [P]laintiff's conservator from the Property and the unlawful trespass as well as for the monetary damages arising from those acts." (App. Ct. at 6). In affirming the Circuit Court, the Court of Appeals reviewed the factual record in some detail:

> Between February 26, 2020 and March 28, 2020, Steven continued to act like he was investing in the property with Alex. He and Alex went together to walk the land and inspect the property. After consulting

---

[11] The difference in the amount of damages awarded against Alex and Defendant is due to attorney fees. For purposes of attorney fees, the court looked to MCLA 600.2591, which allows a court to award attorney fees to the prevailing party if it "finds that a civil action or defense to a civil action was frivolous. . . " The Michigan Court of Appeals has read the statute broadly to include an award of fees where the losing party's conduct was fraudulent. See e.g. *Int'l Outdoor, Inc. v. SS MITX, LLC*, 349 Mich.App. 212 (2023). In the instant case, the Circuit Court found that the conduct of both Alex and Steven was "flagrant and fraudulent" but only Alex's defense was considered "frivolous" under MCL 600.2591 because his position lacked any arguable legal merit. Thus, attorney fees in the amount of $41,204.48 were assessed against Alex, but no attorney fees were assessed against Steven.

more than one attorney, Steven posted a notice of abandonment on the land and recorded the document with the register of deeds, attempting to reduce the redemption period from six months to 30 days. Steven did this even though the conservator's attorney notified him of the conservator's intent to redeem the property. Steven communicated this plan to Alex as evidenced by Alex's telling responding officers on March 28, 2020, that he waited until the end of the 30-day redemption period to move into the home. From this evidence the trial court could reasonably infer a coordinated effort to retain ownership of the property despite the conservator's clearly conveyed intent to redeem. We also note that Alex initiated structural alterations or renovations to the home and cleared personal property from the residence. He did so notwithstanding this was a house purchased by his father and not Alex, which, in and of itself, necessarily suggested that Alex acted with actual authority, either express or implied, granted by Steven. A simple tenancy relationship would generally not allow for such actions. Moreover, there was no evidence that Steven purchased the house as a gift to Alex, leaving him free to do as he alone wished.

*Id.* at 5. The Court of Appeals continued,

[Defendant] Steven claimed that the interaction between the conservator and Alex at the subject property on March 28,2020 made Steven decide against having any further involvement in the deal. Yet, Steven continued to visit the property. He falsely asserted that he was at the house only once. On further inquiry, Steven admitted to at least four visits. The court could reasonably infer that Steven had likely been on the land on other occasions.

A continued agency relationship could also be reasonably inferred from Alex's use of Steven's personal vehicles to assist in moving into and cleaning out the house. If Steven truly ordered Alex not to move into the house as he claimed, it is incredible that he would allow Alex free use of his vehicles to assist in the move and renovation. The presence on the property of vehicles owned by Steven's car dealership, Fenton Fine Used Autos, similarly supported the existence of a continuing agency relationship. Steven initially claimed that he allowed Alex to use these vehicles. But when the court and opposing counsel advised Steven that it is illegal for family members to use dealer plates, Steven suddenly asserted that Alex was an "agent" of the car dealership. By stating that Alex was an agent of Fenton Fine Used Autos, Steven likely

unwittingly admitted to an ongoing business relationship with Alex. Alex also provided support for this ongoing agency relationship. Alex testified that he "regularly" attended automobile auctions for Steven, although he tried to take back that testimony. Even if Steven [sic - presumably, the Appellate Court meant Alex] were not an agent of the dealership, the court could still infer the presence of various dealership vehicles on the land was another sign of Steven's approval of Alex's continued presence. Steven posited that he brought the vehicles to the property for Alex and a friend to repair. If, however, Steven truly wanted no part of Alex's residence in the home, Steven would not have supported Alex's actions in working on dealership vehicles on the premises at issue.

*Id.* at 5-6.

On April 24, 2025, Defendant filed his Chapter 7 bankruptcy petition.

## II. JURISDICTION

Bankruptcy courts have jurisdiction over all cases under Title 11 and all core proceedings arising under Title 11 or arising in a case under Title 11. *See* 28 U.S.C. §§ 1334 and 157. Core proceedings include proceedings to determine dischargeability. 28 U.S.C. § 157(b)(2)(I). The parties have consented to the entry of final orders and judgment by this Court. (Dkt. 12).

## III. APPLICABLE LAW

### A. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (Rule 56 applies in adversary proceedings). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue of material fact in dispute, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *Liberty Lobby*, 477 U.S. at 252. The Court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.R

## B. Inapplicability of *Res Judicata* and Rooker-Feldman

Defendant asserts that the doctrine of *res judicata* applies to preclude Plaintiff from raising the issue of fraud in this Court because that issue was not directly raised

in the state court proceeding. Plaintiff also argues that the Rooker-Feldman doctrine applies to prevent re-litigating any part of the state court judgment in this Court. Neither doctrine applies.

Under the doctrine of *res judicata*, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979). However, bankruptcy courts do not apply *res judicata* in dischargeability proceedings because bankruptcy courts are endowed with exclusive jurisdiction to determine dischargeability. *Brown v Felson*, 442 U.S. 127, 126 (1979); *Spilman v. Harley*, 656 F.2d 224, 226-27 (6th Cir. 1981); *Cresap v. Waldorf (In re Waldorf)*, 206 B.R. 858, 861 (Bankr. E.D. Mich. 1997). Thus, this Court is not barred by *res judicata* from making a determination regarding the dischargeability of the Circuit Court's judgment.

Similarly, while the Rooker-Feldman doctrine provides that a federal trial court may not review a state court decision, that doctrine does not require a federal court to surrender its own exclusive jurisdiction. *Sill v. Sweeney (In re Sweeney)*, 276 B.R. 186, 195 (B.A.P. 6th Cir. 2002). Thus, under the Rooker-Feldman doctrine, while a bankruptcy court may not review the existence of a debt, it may, within its exclusive jurisdiction, determine whether that debt is or is not dischargeable. *Id.*

## C.  Collateral Estoppel

Collateral estoppel "prevents a party from relitigating issues of fact or law that were necessarily decided by a previous final judgment." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). Collateral estoppel applies to nondischargeability actions in bankruptcy proceedings. *Grogan v. Garner*, 498 U.S. 279 (1991).  The bankruptcy court must determine whether applicable state law would give collateral estoppel effect to the state court judgment.  *Bay Area Factors v. Calvert (In re Calvert)*, 105 F.3d 315, 317 (6th Cir. 1997).  Under Michigan law, collateral estoppel applies when,

> 1) there is identity of parties across the proceedings, 2) there was a valid, final judgment in the first proceeding, 3) the same issue was actually litigated and necessarily determined in the first proceeding, and 4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Hinchman v. Moore*, 312 F.3d 198, 202 (6th Cir. 2002)(quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001)(citing *People v. Gates*, 452 N.W. 2d 627, 630-31 (Mich. 1990)).  The party seeking collateral estoppel has the burden of making an evidentiary record sufficient to establish that collateral estoppel applies.

Under Michigan law, an issue is "actually litigated" if it is "put into issue by the pleadings, submitted to the trier of fact for determination, and is thereafter determined." *Phillips v. Weissert (In re Philips)*, 434 B.R. 475, 486 (B.A.P. 6th Cir.

2010)(quoting *Latimer v. William Mueller & Son, Inc.*, 386 N.W.2d 618, 627 (Mich.Ct.App. 1986)).

An issue that is "actually litigated" is also considered to be "necessarily determined" if "it is necessary to the judgment." *See Phillips* at 493. Whether an "actually litigated" issue is also "necessary to the judgment," or "essential to the judgment," in turn, depends on the elements of the claim involved.

Here, the parties do not dispute that the non-dischargeability action before this Court involves the same parties as the state court action or that the state court judgment is valid and final. At issue here is whether the elements needed to establish a nondischargeable debt under § 523(a)(2) and (a)(6) were actually litigated and necessarily determined by the Circuit Court and whether Defendant had a full and fair opportunity to litigate those elements. In order make this determination, this Court must look at the elements of the state law trespass and ejectment claims, along with the factual findings of the state court to determine whether all of the facts necessary for a finding of nondischargeability were established in the Circuit Court proceeding.

## IV. <u>ANALYSIS</u>

### A. <u>General Principles Applicable to Exceptions to Discharge</u>

The main purpose of bankruptcy is to grant a "fresh start to the honest but unfortunate debtor." *Marrama v. Citizens Bank*, 549 U.S. 365, 367 (2007).

> Although the fresh start is an important feature of bankruptcy law, it is not the only one. The Bankruptcy Code, "like all statutes, balances multiple, often competing interests." *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). This balancing is reflected in the scope of a debtor's discharge, which broadly discharges a debtor's prebankruptcy debts, but which is also subject to exceptions. *Id.* at 72. "The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts . . . " *Grogan v. Garner*, 498 U.S. 279, 287 (1991). "Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start." *Id.*

*Buzzard v. Ratliff (In re Ratliff)*, 673 B.R. 719, 732 (Bankr. S.D. Ohio 2025)(parallel citations omitted). Because the bankruptcy discharge is central to a "fresh start," discharge exceptions "are to be strictly construed against the creditor and liberally in favor of the debtor." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 275 (2013)("[E]xceptions to discharge should be confined to those plainly expressed." (citation omitted)(internal quotation marks omitted)); *Board of Trs. v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007)("[E]xceptions to discharge in § 523(a) must be narrowly construed." (citations omitted).

To prevail on the exceptions to discharge under § 523(a), a plaintiff has the burden of proving each of the elements of nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290–91 (1991); *Conti v. Arrowood Indem. Co. (In re Conti),* 982 F.3d 445, 448 (6th Cir. 2020).

**1. 11 U.S.C. § 523(a)(6)--Willful and Malicious Conduct**

The Court first addresses the argument that Plaintiff is entitled to summary judgment on his claim under § 523(a)(6). That section excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). To prevail on a claim under this section, a plaintiff must show that:

> (1) the debtor's conduct was willful and malicious, (2) [the creditor] suffered an invasion of [its] legal rights or to the legal rights to [its] property, and (3) the invasion was caused by the debtor's conduct.

*Morse v. Morse (In re Morse)*, 504 B.R. 462, 475-76 (Bankr. E.D. Tenn. 2014)(citations omitted).

Because section 523(a)(6) limits nondischargeabilty to willful and malicious injuries committed "by the debtor," it is the *debtor's own* deliberate and intentional acts which must result in the injury to another. *See, e.g.*, *Greer v. Bruce (In re Bruce)*, 593 B.R. 765, 777 (Bankr. S.D. Ohio 2018) ("the willful and malicious injury has to be an injury '*by the debtor* to another entity or to the property of another entity[.]' ") (emphasis in original). While fully acknowledging this well-established rule regarding vicarious liability, there is a notable exception:

> [O]ther courts—including courts in this district—have noted **that there is no requirement in § 523(a)(6) that a debtor actually be the person who damages a creditor's person or property**. *See, e.g.*, *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (Speer, J.); *see also H. Park Partners, LLC v. Frick (In re Frick)*, 427

B.R. 627, 635 (Bankr. N.D. Ohio 2010) (Speer, J.); *Yash Raj Films (USA), Inc. v. Akhtar (In re Akhtar)*, 368 B.R. 120, 133 (Bankr. E.D.N.Y. 2007); *Tiffany Square Family v. Williams (In re Williams)*, 362 B.R. 838, 841 (Bankr. N.D. Ohio 2006) (Speer, J.). Nevertheless, this Court believes that under the precedent established by the Supreme Court in *Kawaauhau* and by the Sixth Circuit in *Markowitz*, for the debt to be nondischargeable under § 523(a)(6), the conduct must be the result of willful and malicious conduct *by the debtor*, **such as the debtor directing someone to injure another person**.

*In re Hughley*, No. 17-41946, 2019 WL 2402852, at *5 (Bankr. N.D. Ohio June 5, 2019)(bolded emphasis added).[12]

---

[12]The distinction between holding a defendant vicariously liable for the acts of another and holding a defendant directly liable for his own willful and malicious acts in *directing* a third party to injure another person or his property is an important one. The *Sintobin* case is instructive. It involved a debt arising from willful and malicious acts of debtor-tenant's children and friends in spray painting walls knocking doors off their hinges and otherwise committing waste on leased premises. In holding the debt non-dischargeable, the bankruptcy court stated:

> Notwithstanding this principle, there is no direct requirement under § 523(a)(6) that a debtor actually be the entity which physically occasions the actual damages to the person or property. **Thus, any debtor who seeks or encourages another person to commit a willful and malicious act would not, for purposes of § 523(a)(6), be entitled to have any liability arising therefrom discharged in bankruptcy. Further, the types of encouragement which may lead to a finding of nondischargeability under § 523(a)(6) can range from overt encouragement to simply an omission, if such an omission was calculated by the debtor in a willful and malicious manner to cause injury.** This interpretation is in accordance with generally accepted principles of tort law, which as held by the Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), underpin the § 523(a)(6) exception to discharge. In addition, such an interpretation furthers the policy goal of § 523(a)(6) which is to except from a bankruptcy discharge those debts incurred by morally

The analysis under 523(a)(6) is two pronged:  the injury must be both willful *and* malicious.   Because the word "willful" modifies the word "injury" "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). A willful injury results when the debtor either desires to cause the consequences of his act or "believes that the consequences are substantially certain to result from it." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).  As one bankruptcy court has explained,

> "'[t]o find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind, subjectively.'" *Gabel v. Olson (In re Olson)*, 355 B.R. 660, 665 (Bankr.E.D.Tenn.2006) (quoting *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004)).
>
> **Proof of willful behavior must often be demonstrated through the use of circumstantial evidence.** *See In re Jones*, 276 B.R. at 802. The bankruptcy court in *In re Jones* noted that "willful" behavior can "be
> _____
> reprehensible conduct. *Murray v. Wilcox (In re Wilcox)*, 229 B.R. 411, 418 n. 7 (Bankr. N.D. Ohio 1998). For example, in *In re Cornell*,[42 B.R. 860 (Bankr. E.D. Wash. 1984)] the bankruptcy court, in addressing a parent's liability for the actions of her son, stated: "Analysis of the historical background of § 523(a)(6) demonstrates that **where there is conduct of an exceptionally culpable nature, participated in or permitted by a responsible person, the liability resulting therefrom may not be dischargeable."** *In re Cornell*, 42 B.R. at 864.

*In re Sintobin*, 253 B.R. at 830-31 (emphasis added, parallel citation omitted).

> indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those rights." *Id*. As another bankruptcy court in this Circuit recently observed, "[t]he willfulness element is designed to separate negligent or inadvertent acts from deliberate and intentional ones, and to ensure that the conduct in question falls within the ambit of an intentional tort." *In re Wierenga*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010).

*Morse v. Morse (In re Morse)*, 504 B.R. 462, 475-76 (Bankr. E.D. Tenn. 2014)(emphasis added).

A person acts "maliciously" when that person acts "in conscious disregard of his duties or without just cause or excuse." *Wheeler v. Laudni*, 783 F.2d 610, 615 (6th Cir. 1986). "A 'just cause' is defined as a 'legally sufficient reason' and a 'just excuse' is defined as a 'reason that justifies an act or omission or [] relieves a person of duty." *MarketGraphics Research Group, Inc. v. Berg (In re Berg)*, 953 F.3d 907, 915 (6th Cir. 2020)(quoting BLACK'S LAW DICTIONARY (11th ed. 2019)). "Elaborating on the meaning of 'conscious disregard,' the Sixth Circuit Bankruptcy Appellate Panel has explained that '[t]here must be a consciousness of wrongdoing .... It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under § 523(a)(6).'" *Buzzard,* 673 B.R. at 742 (citations omitted). Malice "does not require ill-will or specific intent to do harm." *Wheeler* at 615.

### a.  <u>What issues did the Circuit Court decide with respect to trespass?</u>

Looking first at the Circuit Court trespass claim, the Michigan Court of Appeals recently explained that, under Michigan law,

> Trespass is defined as "an invasion of the plaintiff's interest in the exclusive possession of his land." *Terlecki v Stewart*, 278 Mich App 644, 653-654; 754 NW2d 899 (2008) (quotation marks and citation omitted). Trespass is an intentional tort. *Id*. at 654. "[R]ecovery for trespass to land is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Id*. (quotation marks and citation omitted). The intent element relates to the intent to be on the land where the trespass occurred—not the intent in causing a trespass. See *Traver Lakes Community Maintenance Ass'n v Douglas Co*, 224 Mich App 335, 345; 568 NW2d 847 (1997).

*Kanas v. Travis*, No. 369445, 2025 WL 2618805, at *9 (Mich. Ct. App. Sept. 10, 2025), *appeal denied*, 30 N.W.3d 99 (Mich. 2026).

Clearly, the level of intent required to establish a claim for trespass is lower than that required to show a willful and malicious injury under § 523(a)(6).  That being said, however, intent *is* an element of trespass and to find a defendant liable for trespass, a state court, at a minimum, must make a finding regarding whether a defendant intended to be on a plaintiff's land.

In this case, viewing the Circuit Court's written opinion solely as to *Defendant's* actions (because, for purposes of a claim under § 523(a)(6), Defendant cannot be held accountable vicariously for any acts of another), the Circuit Court made the following findings of fact regarding Defendant:

-Defendant claimed he was the owner of the Property subject to Plaintiff's right of redemption.

-Eight days after the foreclosure sale, Defendant was notified of Plaintiff's intent to redeem the Property and was told to stay off the premises. Notwithstanding that knowledge, 13 days after the foreclosure sale, Defendant entered the Property and, in an effort to shorten the redemption period to 30 days, posted a notice falsely claiming that the Property was abandoned.

-Defendant recorded a notice of abandonment with the register of deeds.

-Knowing that the Property was going to be redeemed, Defendant allowed his son to move on to the Property.

-Defendant began to receive mail at the Property and had himself listed as the owner of the Property for purposes of property taxes.

-Defendant parked vehicles owned by his company on the Property.

-Defendant visited the Property multiple times and permitted renovations to begin at the Property.

-Defendant actively avoided all attempts by Plaintiff to deliver the redemption proceeds to Defendant "hoping the redemption period would run and the Property would vest with him. . . ."

The Circuit Court was satisfied that Defendant's intrusion on the Property was intentional. Although the state court was not required to address whether that intent rose to the level of "willful and malicious," the Circuit Court's findings of fact as to Defendant's actions nevertheless clearly established a willful and malicious injury sufficient to establish a claim under § 523(a)(6). This Court will not ignore those findings.

Under §523(a)(6), a willful injury is deliberate or intentional. A willful injury results when the actor either desires to cause the consequences of his actions or believes that the consequences are substantially certain to result. In this case, the Circuit Court specifically found that the intended consequence of Defendant's actions was to shorten the redemption period to 30 days and take full ownership of the Property prior to the expiration of the six-month redemption period to which Plaintiff was entitled. To that end, Defendant, fully aware that Plaintiff intended to redeem the Property, entered the Property, posted a notice of abandonment, and proceeded to treat the Property as his own. He allowed a third party to move into the house, make physical changes to the Property, and remove Plaintiff's personal property. He had his mail delivered to the Property, listed himself as owner for tax purposes, and parked his company's vehicles on the Property. His actions kept Plaintiff (through his conservator) from accessing the Property for several months. Defendant's actions directly interfered with Plaintiff's ownership rights -- rights which remained with Plaintiff during the redemption period. Every action taken by Defendant was taken in furtherance of his desire to dispossess Plaintiff of his ownership interest in the Property. While Defendant failed in permanently dispossessing Plaintiff, Defendant succeeded in dispossessing Plaintiff for months on end resulting in physical damage to the Property and loss of Plaintiff's personal

property. On this record, this Court cannot see how this injury can be construed as anything but willful.

Turning to the second prong of § 523(a)(6), an injury is malicious when it occurs in conscious disregard of one's duties or without just cause (i.e. without a legally sufficient reason). In this case, the Circuit Court's opinion clearly states that at the time Defendant entered the Property to post the abandonment notice, he had received notice of Plaintiff's intent to redeem the Property and had been warned to stay off the Property. Notwithstanding that knowledge, Defendant posted the abandonment notice and proceeded to treat the Property as his own. Again, Defendant allowed a third party to move into the house, allowed renovations to begin, and took no action to remove that third party from the Property. On this record, there is simply no basis for Defendant to assert that he had a legal justification for his actions.

Collateral estoppel requires that Defendant had a full and fair opportunity to litigate the issue of intent in the Circuit Court and this Court finds that he did. As previously discussed, Defendant's intent was directly relevant to the Circuit Court's verdict. Defendant was on notice that he was defending a trespass action and that his intent was at issue. Plaintiff's Amended Complaint made it readily apparent that Plaintiff viewed Defendant's actions as not only intentional, but worthy of an award

of exemplary damages and attorney fees "based on Defendants' *willful and malicious* trespass." (Dkt. 19-8 at 8 ¶ C)(emphasis added).

To show that he lacked the requisite intent to injure Plaintiff, Defendant now asserts that his actions were the result of mere mistake. Defendant contends that he believed the Property was abandoned because he was aware that Mark Latunski was incarcerated for life and would not be returning to the Property. (Dkt. 19, Ex. 3).[13] For purposes of this Motion, the Court takes that assertion as true. However, Defendant's belief that Mark Latunski would never again occupy the Property does not negate the Circuit Court's finding that Defendant received timely notice that Mark Latunski, through his conservator, was redeeming the Property and unquestionably knew that the Property was not abandoned. Because the Property

---

[13] Defendant's affidavit, attached to his Motion for Summary Judgment makes the following assertions:

> -Even when I was aware that Plaintiff may attempt to redeem the Property, I believed that abandonment was appropriate when it was public knowledge that Mark Latunski had been imprisoned for murder. It would be impossible for him to occupy the property while he was in prison.
> -Further, my inspection did reveal that the property was physically abandoned.
> -I have at no point intended to harm or cause injury to Mark Latunski.
> -I have at no point intended to harm or cause injury to Paul Latunski.
> -I never intended to deceive Mark Latunski.
> -I never intended to deceive Paul Latunski.
> -My only objective during this entire series of events was to provide a home to my son.

Affidavit of Steven Deehl, Dkt. 19, Ex. 3 ¶¶ 12,13,17-21).

was not abandoned, Defendant had no right to be on the Property at all, let alone permit a third party to occupy it, make physical changes to it, and dispose of Plaintiff's personal property. It is fair to say that the Circuit Court found that every action and decision made by Defendant when he posted the notice of abandonment and thereafter was made with the intent to dispossess Plaintiff of the Property so that the Property would vest entirely with Defendant. The Circuit Court's findings support this Court's conclusion that Defendant intended to injure Plaintiff by permanently dispossessing Plaintiff of the Property and claiming full ownership for himself.

Because this Court is satisfied that Defendant had a full and fair opportunity to litigate all of the elements of nondischargeability under § 523(a)(6), the Court finds that the requirements of collateral estoppel have been satisfied.[14]

---

[14] In his Brief in support of his Motion for Summary Judgment, Defendant makes another argument worth briefly mentioning. Defendant asserts,

> Even if it can be shown that Dr. Deehl was intentionally interfering with Mark Latunski's redemption rights, "knowledge that legal rights are being violated is insufficient to establish malice. . . " *In re Morse*, 504 B.R. 462, 475 (Bankr. E.D. Tenn. 2014)(quoting *In re Best*, 109 Fed. Appx 1,6 (6th Cir. 2004). Perhaps more importantly, there is no support for the idea that Dr. Deehl's direct actions and inactions even caused injury in the first place. After all, it is undisputed that the Plaintiff successfully redeemed the subject property.

Defendant's Brief, Dkt. 19 at 6-7). Defendant appears to be arguing that even if he knew that his actions violated Plaintiff's right to redeem the Property, that action alone, is insufficient to support a finding of malice. Defendant's argument

### b. **What issues did the state court decide with respect to ejectment?**

According to the Circuit Court, Plaintiff's claim for ejectment is based on MCLA 600.2918 (known as the anti-lockout statute), which provides, in relevant part:

> Any person who is ejected or put of any lands or tenements in a forcible and unlawful manner, or being out is afterwards held and kept out, by force, is entitled to recover 3 times the amount of his or her actual damages or $200.00, whichever is greater, in addition to recovering possession.
>
> . . .

MCLA 600.2918(1). An action for ejectment requires a plaintiff to demonstrate a present right to possession of the disputed property and that he or she have been ousted, deprived of possession, or that possession is wrongfully withheld by the defendant. *See, Francis v. Hudson*, 133 N.W.2d 212, 215-16 (Mich. App. 1965). As the Circuit Court recognized, the statute is designed to prohibit forceful self-help and to prevent parties from taking the law into their own hands in circumstances which are likely to result in a breach of the peace. (Cir. Ct. at 8).

---

materially misstates the nature of the injury caused by Defendant's conduct. Defendant did not simply interfere with Plaintiff's right to redeem the Property, he entirely *dispossessed* Plaintiff from his property for months on end, knowingly permitted the removal of Plaintiff's personal property, and knowingly permitted a third party to significantly damage the property. The fact that Plaintiff was eventually able to recover the Property by filing an eviction action does not negate the very real injuries that resulted from Defendant's actions

The Circuit Court's findings with respect to ejectment focused on the conduct of the third party who was given access to the Property by Defendant, his son Alex. The Circuit Court found that the altercation between Alex and the conservator (*see* footnote 5, *supra*) gave rise to liability for ejectment because Alex falsely represented to the police that he owned the Property so that the conservator would be removed from the Property and ordered not to return. While the charges against the conservator were later dismissed, the conservator was initially charged with a felony. (Cir. Ct. at 7-11).

Again, looking at the Circuit Court's written opinion solely as to *Defendant's* actions, it is clear to this Court that every action taken by Alex was taken pursuant to, and consistent with, Defendant's intent to injure Plaintiff by entirely dispossessing him of the Property. As previously discussed, § 523(a)(6) does not require that a debtor be the person who actually damages a creditor's person or property. A debtor is liable for *his own* actions in directing or encouraging injury to another party. That Alex had access to the Property at all was a direct result of Defendant's intentional decision to treat the Property as his own in violation of Plaintiff's ownership rights. He directed and permitted Alex to move onto the Property. Once he occupied the Property, every action taken by Alex-- the removal of Plaintiff's personal property, the damage from the renovations, the actions taken to keep the conservator off the land -- were taken because Defendant directed Alex

to treat the Property as his own. The Court views these facts as falling squarely within the *Sintobin* case and cases cited therein.

To distance himself from any responsibility for Alex's conduct, Defendant asserted in the Circuit Court proceeding that the altercation between Alex and the conservator made him "decide against having any further involvement in the deal." (App. Ct. at 2). That assertion, along with the March 9th email sent by Defendant's attorney to Plaintiff's attorney (stating that Steven had no responsibility for Alex's occupation of the [P]roperty, had told Alex to vacate the Property, and invited Plaintiff to initiate an eviction proceeding against Alex) *might* stand as evidence that Defendant lacked willful and malicious intent to injure Plaintiff, had the Circuit Court found them credible, or had Defendant actually acted upon them.

The Circuit Court expressly found that the March 9th email was not credible. Moreover, when Defendant was asked why he allowed Alex to occupy the Property instead of calling the police to oust Alex, and Defendant responded that he could not control Alex, a response the Circuit Court found not credible "given that Alex acted at Steven's discretion in buying the [P]roperty, drove Steven's vehicles, used dealership plates from Steven's vehicle, and lived in the home all while Steven tried to thwart the redemption process." (Cir. Ct. at 14-15). The record indicates that after this altercation, Defendant took no steps to remove Alex from the Property nor did

he communicate to Plaintiff that he intended to cooperate in the redemption process.[15]

Based on the Circuit Court's findings of fact, this Court is satisfied that the elements of collateral estoppel have been satisfied. Plaintiff's Motion for Summary Judgment pursuant to § 523(a)(6) should be granted and Defendant's Cross-Motion for Summary Judgment pursuant to § 523(a)(6) should be denied.

### 2. 11 U.S.C. § 523(a)(2)(A): Nondischargeability based on Fraud

11 U.S.C. § 523(a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A). As explained by the Court of Appeals for the Fourth Circuit, "Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning the debtors money or giving the debtors property, services, or credit through fraudulent means." *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 219-20 (4th Cir. 2007).

> The plain language of [§523(a)(2)(A)] requires the debtor to have obtained money, property, services, or credit through her fraud or use of false pretenses. It is clear from the structure of the phrase that "to the extent obtained" modifies the money, property, services, or credit that constitute the debt. **A plain reading of this subsection demonstrates that Congress excepted from discharge not simply any debt incurred as a result of fraud but only debts in which the debtor**

---

[15] In his March 9th email, Defendant essentially conceded that *Plaintiff* was the true owner of the Property and had standing to evict Alex. Defendant, by his inaction (including any effort to remove Alex from the Property) knowingly extended the ongoing injury to Plaintiff.

**used fraudulent means to obtain money, property, services, or credit. Structurally, the subsection can have no other meaning.**

*Id.* at 219 (emphasis added). This Court agrees with the Fourth Circuit and, accordingly, the initial question for this Court is whether Defendant obtained money, property or services from Plaintiff.

Plaintiff asserts that Defendant, through fraudulent means, interfered with Plaintiff's right to redeem the Property from the foreclosure sale and temporarily dispossessed Plaintiff of his right to use, occupy and control the Property. Plaintiff further asserts that during the period Plaintiff was dispossessed, Defendant permitted a third party to gain access to the Property, remove and dispose of Plaintiff's personal property and begin making physical alterations to the Property. In this Court's view, these allegations do not fit neatly within the framework of § 523(a)(2) because Plaintiff eventually redeemed the Property, the third party was forcibly removed, and Defendant never actually gained ownership of the Property.

It is true that Defendant's posting of the abandonment notice on the Property while fully aware of Plaintiff's intent to redeem it was a misrepresentation. And, as previously discussed, that misrepresentation was made with the intent to allow Defendant to gain immediate control and complete ownership of the Property. But those actions do not show that Defendant tricked Plaintiff into parting with the Property as contemplated by § 523(a)(2). Again, *Nunnery,* 478 F.3d 215 is instructive.

In *Rountree*, the debtor, Rountree, was a private investigator hired by an insurance company to investigate the validity of injuries claimed by the creditor, Nunnery, after a car accident. Rountree befriended Nunnery and persuaded her to engage in physical activities despite her injuries, videotaped the activities, and provided the footage to the insurance company for use in its litigation against Nunnery. These actions led Nunnery to sue Rountree in state court where she obtained a judgment against Rountree for fraud and was awarded compensatory damages for emotional distress as well as punitive damages. Rountree then filed bankruptcy seeking to discharge the state court judgment. Nunnery filed a nondischargeability action pursuant to § 523(a)(2), arguing that the judgment arose from fraud. In defending the nondischargeabiliy action, Rountree asserted that §523(a)(2) did not apply because she never obtained anything (money or property) from Nunnery.

The Fourth Circuit, focusing on "whether the law requires that the debtor fraudulently obtained something from the creditor or that the debtor simply have engaged in fraud that results in a debt owed to a creditor," (*Id.* at 220), held that §523(a)(2) did not apply because Rountree did not obtain money, property, services or credit from Nunnery through her fraudulent actions. The court noted that "§ 523 provides other avenues for victims of fraud whose debtors have not obtained anything from them to protect their claims: '[F]raud judgments in cases in which the

defendant did not obtain money, property, or services from the plaintiffs . . . are more appropriately governed by § 523(a)(6).'" *Rountree* at 220 (quoting *Grogan v. Garner*, 498 U.S. 279, 282 n.2).[16] The court further noted that that subsection (a)(2)(A) "is best read to prohibit the discharge of any liability arising from a debtor's fraudulent *acquisition* of money, property, etc. . . for fraud." *Rountree* at 222, quoting *Cohen v. De La Cruz*, 523 U.S. 213, 221(emphasis added by *Rountree*).

In this case, Defendant did not obtain money or property from Plaintiff. While Defendant *attempted* to obtain the Property, and he *temporarily* gained control over the Property, he failed in obtaining title to the Property. On these facts and considering the persuasive guidance of the Fourth Circuit's *Rountree* decision, the Court holds that Plaintiff does not have a claim under § 523(a)(2).

### 3. **Damages**

The Circuit Court judgment awarded Plaintiff actual damages of $302,311. This amount reflects $179,090 for lost or stolen property, $63,021 for construction costs, $2,675 for electrical costs, $33,525 for probate fees, and $24,000 for loss of

---

[16] In a footnote, the *Rountree* court noted that "in this case, the Bankruptcy Court rejected Nunnery's claim under subsection (a)(6) and Nunnery did not appeal that decision. Given our understanding of the extent of the exception articulated in subsection (a)(2)(A), Nunnery perhaps would have had a stronger claim for relief had she made that appeal." *Rountree,* 478 F.3d at 220, n. 2.

use. The actual damages were trebled pursuant to MCLA 600.2918(1) resulting in a total judgment against Defendant in the amount of $906,933.

This Court finds that the Circuit Court's judgment is the result of injuries that were willfully and maliciously inflicted by Defendant. "[U]nder § 523(a)(6), once a willful and malicious injury is found, its plain language mandates the conclusion that all liabilities imposed by non-bankruptcy law that are traceable to that injury are excluded from discharge. This includes punitive damages, statutory damages, and any other relief provided by applicable law." *Buzzard,* 673 B.R. at 743, *citing Abbo v. Rossi, McCreery & Assoc. (In re Abbo)*, 168 F.3d 930, 931 (6th Cir. 1999) and *Her, Inc. v. Barlow (In re Barlow)*, 478 B.R. 320, 333-34 (Bankr. S.D. Ohio 2012).

Because all of the damages underlying the Circuit Court judgment are traceable to Defendant's willful and malicious conduct, the entire judgment is nondischargeable.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is granted as to § 523(a)(6) and denied as to § 523(a)(2). Defendant's Cross-Motion for Summary Judgment is denied as to § 523(a)(6) and granted as to § 523(a)(2).

Signed on March 10, 2026



/s/ Joel D. Applebaum

**Joel D. Applebaum**
**United States Bankruptcy Judge**